IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| PAUL R. KEARNS, | )  CASE NO.  3:19 CV 01243 |
| | ) |
| Plaintiff, | ) |
| | )  JUDGE JEFFREY J. HELMICK |
| vs. | ) |
| | )  MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | )  JONATHAN D. GREENBERG |
| SECURITY, | ) |
| | )  **REPORT & RECOMMENDATION** |
| Defendant. | ) |

Plaintiff Paul Kearns ("Plaintiff" or "Kearns") challenges the final decision of Defendant Andrew

Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application for a Period of

Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under

Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate

Judge recommends that the Commissioner's final decision be AFFIRMED IN PART and VACATED

AND REMANDED IN PART for further consideration consistent with this opinion.

## I.   PROCEDURAL HISTORY

In April 2018, Kearns filed an application for POD and DIB, alleging a disability onset date of

June 4, 2015 and claiming he was disabled due to back injury, arthritis in the back, arthritis in the left hip,

PTSD, right L5 radiculopathy, and muscle spasms. (Transcript ("Tr.") 194-95, 242.) The application was

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

denied initially and upon reconsideration, and Kearns requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On February 7, 2019, an ALJ held a hearing, during which Kearns, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On March 13, 2019, the ALJ issued a written decision finding Kearns was not disabled.  (*Id.* at 15-30.)  The ALJ's decision became final on April 1, 2019, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On May 31, 2019, Kearns filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 10, 12.)  Kearns asserts a single assignment of error: "The ALJ's decision should be reversed because the mental residual functional capacity is not supported by substantial evidence."  (Doc. No. 10 at 6.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Kearns was born in June 1981 and was 37 years old at the time of his administrative hearing (Tr. 40), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c).  He has at least a high school education and is able to communicate in English.  (Tr. 29.)  He has past relevant work as a radio operator/electronics technician, fast food shift manager, and a composite position of filler and grinder/powder compounder.  (*Id.* at 28.)

### B.    Medical Evidence[2]

School records show Kearns had an Individualized Education Program while in school.  (*Id.* at 314-34.)  An academic performance evaluation noted Kearns was unable to memorize facts for tests, although he could remember visuals used in class, he was unable to go from one task to another, and his

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Further, since Kearns challenges only the ALJ's mental residual functional capacity finding, the Court's discussion of the evidence will be limited to Kearns's mental impairments.

ability to stay on task was limited.  (*Id.* at 327.)

In September 2016, Kearns saw psychiatrist Mohan R. Nemali, M.D., at the VA for medication management.  (*Id.* at 583-84.)  Kearns reported experiencing nightmares and flashbacks from his time in Afghanistan, being unable to go into crowded places, feeling like someone is following him while he is driving, and being unable to trust people.  (*Id.* at 584.)  Kearns stated he sleeps five to six hours a night and reported being tired.  (*Id.*)  He reported he had nightmares two to three times a week that would wake him up, and sometimes he would be unable to go back to sleep.  (*Id.*)  He denied thoughts or plans of harming himself or others.  (*Id.*)  On examination, Dr. Nemali found Kearns's eye contact was good, his mood mildly dysphoric, his affect somewhat restricted, his memory intact, his insight fair, and his judgment good.  (*Id.* at 584-85.)  Kearns's diagnoses consisted of PTSD and tobacco use disorder.  (*Id.* at 585.)

On January 26, 2017, Kearns saw Donald Arthur, M.D., for physical complaints.  (*Id.* at 688-91.) Dr. Arthur noted Kearns's "cognition and attention appear mildly slowed again consistent with his previous visit."  (*Id.* at 688.)  Dr. Arthur's treatment notes also include the following assessment: "Likely posttraumatic stress disorder secondary to military service with deployment to Afghanistan.  He felt that using Minipress was helping with this issue, although he did not take the medication consistently. Currently he is endorsing good sleep.  Patient had been concerned about side effect of hypotension and at the advice of his wife had stopped taking this medication."  (*Id.* at 691.)

On February 24, 2017, Kearns saw Dr. Arthur again.  (*Id.* at 692.)  Dr. Arthur's treatment notes reflect findings similar to those from the January 26, 2017 visit.  (*Id.* at 692-96.)

On March 16, 2018, Kearns saw Susan Hubbell, M.D., for a recheck appointment concerning physical complaints.  (*Id.* at 700.)  Dr. Hubbell noted Kearns "is treated for PTSD at the Marion VA.  He said that definitely affects his sleeping pattern.  He served in Afghanistan."  (*Id.* at 701.)  Dr. Hubbell's

3

impressions included the following: "Post traumatic stress disorder which is a service-connected problem treated at the VA.  I think his ability to concentrate and do an exercise program is affected by the PTSD." (*Id.*)

On June 12, 2018, Kearns saw Ryan Wagner, Psy.D., for a consultative examination.  (*Id.* at 1284.)  Kearns reported his activities of daily living included doing chores, preparing meals, driving himself, caring for his children, going shopping, paying bills, and making his own appointments.  (*Id.* at 1286.)  He was living with his family and regularly saw a couple friends.  (*Id.*)  On examination, Dr. Wagner found Kearns's thought processes "somewhat slowed as he was sometimes delayed in responding to questions."  (*Id.*)  Dr. Wagner noted Kearns's thought content was noticeable for chronic anxiety.  (*Id.*)  Kearns presented with a flattened affect and a downcast facial expression, and only occasionally made eye contact.  (*Id.*)  However, Kearns denied any serious depressive symptoms.  (*Id.*)  Dr. Wagner noted Kearns "appeared tense and on edge throughout the examination."  (*Id.*)  "He squeezed his hands together tightly and his voice wavered at times."  (*Id.*)  Kearns struggled with serial sevens, which suggested "some difficulty maintaining attention and focus."  (*Id.* at 1287-88.) Kearns displayed adequate task persistence when answering questions but displayed some indications of distraction during the evaluation.  (*Id.* at 1288.)

Dr. Wagner diagnosed Kearns with PTSD.  (*Id.* at 1287.)  Dr. Wagner determined Kearns's performance on a brief abstract reasoning activity and a brief short-term memory activity did not suggest difficulty in understanding or remembering instructions.  (*Id.* at 1288.)  Dr. Wagner opined Kearns "described potential impacts of mental health problems on work performance which may lead to emotional instability when presented with critical supervisory feedback and difficulty developing and maintaining appropriate co-worker relationships."  (*Id.*)  Dr. Wagner further opined Kearns "described

4

anxious symptoms that may compromise his ability to respond to work pressures that lead to an increased likelihood of agitation and experiences of panic attacks." (*Id.* at 1289.)

## C.    State Agency Reports

On June 26, 2018, state agency reviewing psychologist Cindy Matyi, Ph.D., opined that Kearns's condition limited him to understanding and remembering simple (1-2 step) instructions and occasional complex (3-5 step) instructions.    (*Id.* at 88.)  He could maintain attention, make simple decisions, and adequately adhere to a schedule, but there could be no strict time limits or production standards.  (*Id.* at 88-89.)  Kearns could interact with coworkers, supervisors, and the public on a superficial basis.  (*Id.* at 89.)  Kearns's symptoms also limited him to "an environment without frequent changes in routine and where those changes could be readily explained." (*Id.* at 89.)  Dr. Matyi also opined Kearns "may benefit from a relatively isolated workstation and supervisory support when first learning job tasks." (*Id.* at 89.)  Dr. Matyi opined Kearns was not significantly limited in his ability to sustain an ordinary routine without special supervision, set realistic goals or make plans independently of others, make simple work-related decisions, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (*Id.* at 88-89.)

On July 31, 2018, Todd Finnerty, Psy.D., affirmed Dr. Matyi's findings on reconsideration.  (*Id.* at 110-13.)

## D.    Hearing Testimony[3]

During the February 7, 2019 hearing, Kearns testified to the following:

- He has a valid driver's license and has no problems or limitations with driving.  (*Id.* at 40.)

- He lives in a two-story house with his wife and two young sons.  (*Id.* at 46-47.)

---

[3] Again, since Kearns challenges only the ALJ's mental residual functional capacity finding, the Court's discussion of the hearing testimony will be limited to Kearns's mental impairments.

- He is still having mental health symptoms. (*Id.* at 50.) He described his symptoms as feeling like his "insides are shaking," which happens every day. (*Id.* at 50-51.) His chest feels painful and his hand tends to shake sometimes. (*Id.* at 50.) He does not go to fireworks anymore and he does not like being in big crowds. (*Id.* at 50-51.) He also gets headaches three times a week now. (*Id.* at 51.) He is not seeing a counselor right now and he stopped taking medication because he and his wife noticed his symptoms were getting worse. (*Id.*) He had not discussed the side effects or stopping the medication with his VA doctor. (*Id.*) While he was taking the medication, he did not notice an improvement in the shaking or his other symptoms. (*Id.*) He stopped receiving psychological treatment at the VA because he was having a hard time finding babysitters. (*Id.* at 53.)

- He has nightmares. (*Id.* at 56.) He also has trouble sleeping at night because he feels on guard all the time. (*Id.*) When driving, he feels like people are following him, and he will take different routes to see if he is being followed. (*Id.*) When he was working, loud noises would cause him to take cover (hit the ground). (*Id.* at 57.) He did not get along with people very well while he was working and kept to himself because he does not like dealing with stupidity. (*Id.*)

- He had one flashback while at a friend's house when fireworks went off wrong and he took cover. (*Id.* at 58.)

- His memory is not very good; he notices that if he is in the middle of getting something, he forgets what he is doing and must try to "trace back" what he was doing. (*Id.* at 60.) He is sometimes able to concentrate on an hour-long TV show. (*Id.*) When he gets stressed out, he takes a drive in the country or steps outside. (*Id.*)

- Generally, during the day he wakes up with his sons, feeds them breakfast, and has them play with their toys while he tries to get some housework done. (*Id.* at 53.) He must take a lot of breaks. (*Id.*) Sometimes if his sons "get carried away" or the youngest screams a lot, it causes him to shake inside and he will put them in time out. (*Id.*) If they do not stop, he will put them back in timeout or put the TV on to have a break to calm down. (*Id.*) He will put the TV on three times a day every day to get a break. (*Id.* at 58.) If his sons are really on his nerves and he feels like he is shaking inside, he tries to calm the situation down and sometimes will call his parents to come over. (*Id.* at 62.) His parents come by a lot sometimes. (*Id.*)

- He does not get much sleep at night; probably about five hours sometimes. (*Id.* at 61.)

- He does not think he could work an eight-hour day because of problems shaking too much and not being able to handle being around other people sometimes. (*Id.* at 59-60.) He did not think he could do some of his past work that did not involve heavy lifting because of interacting with customers. (*Id.* at 60.) He also did not think he could do a sit-down job that did not require him to interact with people too much. (*Id.* at 60-61.)

6

- He "jumped" in the meeting room before the hearing because he heard a noise on his right side.  (*Id.* at 61.)  That is how it is normally for him.  (*Id.*)

The VE testified Kearns had past work as a radio operator, fast food shift manager, and a composite position of filler and grinder.  (*Id.* at 64-65.)  The ALJ then posed the following hypothetical question:

> For the first hypothetical we're going to have a hypothetical individual who can perform less than a full range of medium work. This individual can occasionally climb ladders, ropes or scaffolds, I'm sorry, this individual can never climb ladders, ropes or scaffolds, occasionally crouch, stoop and crawl and frequently climb ramps and stairs, balance and kneel. This individual can have occasional exposure to unprotected heights or unprotected moving mechanical machinery. This individual can understand, remember and carry out simple routine tasks, make judgments on simple work and respond appropriately to usual work situations and changes in the routine work setting with few and occasional changes.  This individual cannot engage in direct public service work and can only be in the proximity of the general public on the occasional basis. This individual can have occasional interaction with supervisors and co-workers with no team or tandem tasks.  Given this hypothetical can the hypothetical individual perform any of the past work that has been identified?

(*Id.* at 65.)

The VE testified the hypothetical individual would not be able to perform Kearns's past work.  (*Id.* at 66.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as hand packagers, kitchen helpers, and floor waxer.  (*Id.*)  The ALJ then modified the hypothetical to reflect a residual functional capacity for light work.  (*Id.*)  The VE testified the hypothetical individual still could not perform Kearns's past work but could perform other representative jobs in the economy, such as housekeeping cleaner, merchandise markers, and routing clerk.  (*Id.* at 66-67.)

The ALJ then modified the first two hypotheticals to add that the "individual can never climb ladders, ropes or scaffolds and can occasionally climb ramps and stairs, balance, crouch, kneel, stoop and crawl."  (*Id.* at 67.)  The VE testified the light occupations would remain unchanged, but at medium

exertion only the hand packager job would remain.  (*Id.*)  There were no other medium exertion jobs that would replace the two eliminated.  (*Id.*)

The following exchange occurred between counsel, the VE, and the ALJ:

Q      If an individual would require a work setting that would be relatively isolated --

ALJ:    How would you define relatively isolated?

ATTY:   Less than occasional interaction with co-workers, maybe, lets [sic] say 15, no more than 10 to 15 percent of the day having any interaction with co-workers and no more than occasional interaction with supervisors but such interaction with the supervisors must be supportive as opposed to being critical or, would that allow

ALJ:    I think that, that I think we've got a problem because, and I know where you're getting that from, from the DDE but that's not in vocational terms so I'm not exactly sure if Mr. McVee is even going to be able to answer that question because that is not in vocational terminology.

BY THE ATTORNEY:

Q      Let me start, can you, are, does that provide enough information, Mr. McVee?

A      I will state that in competitive employment one is expected to meet the standards and the rigors of the work day. Those standards generally include being able to take supervision, understand supervision and conform to whatever that supervisor would like for that individual to do. The individual must report to work on time, be productive throughout the work period and stay for the duration of that work period.  If the individual could not meet any one of those standards that individual would not be able to maintain competitive employment.

Q      So if presented with a critical or corrective instruction from a co-worker, if occasionally the worker would become irritable, emotionally unstable in terms of anger or outbursts such that he would have difficulty either developing or maintaining appropriateness in interaction with co-workers and supervisors that would be work preclusive?

A      In my opinion, yes.

ATTY:   That's all the questions I have, Your Honor, thank you.

(*Id.* at 69-70.)

## III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step,

even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 404.1520(g), 404.1560(c).

Here, Kearns was insured on his alleged disability onset date, June 4, 2015, and remains insured through December 31, 2020, his date last insured ("DLI"). (Tr. 15.) Therefore, in order to be entitled to POD and DIB, Kearns must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The claimant has not engaged in substantial gainful activity since June 4, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: left hip osteoarthritis and trochanteric bursitis; lumbar degenerative disc disease; and psychological conditions variously diagnosed as anxiety and post-traumatic stress disorder (PTSD). (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except [sic] The claimant can never climb ladders, ropes, or scaffolds; occasionally crouch, stoop, and crawl; and frequently climb ramps and stairs, balance, and kneel. He can have occasional exposure to unprotected heights or unprotected moving mechanical machinery. The claimant can understand, remember, and carry out simple, routine tasks, make judgments on simple work, and respond appropriately to usual work situations and changes in a routine work setting with few and occasional changes. The claimant cannot engage in direct public service work and can only be in the proximity of the general public on an

occasional basis.  He can have occasional interaction with supervisors and coworkers with no team or tandem tasks.

6.   The claimant is unable to perform any past relevant work.  (20 CFR 404.1565).

7.   The claimant was born on June **, 1981 and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from June 4, 2015, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-30.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec*., 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the

11

Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

Kearns argues the ALJ "either improperly discredited the mental health evidence of record, or she failed to account for all of the limitations she did credit."  (Doc. No. 10 at 7.)  Kearns asserts the ALJ improperly discounted the opinion of consultative examiner Dr. Wagner by "merely declaring them based on Mr. Kearns' subjective comments."  (*Id.* at 11.)  Kearns asserts the ALJ also erred in her treatment of the state agency reviewing sources' opinions by omitting the following limitations from the residual functional capacity ("RFC") and failing to explain why: (1) superficial interaction with others; (2) pace-related restrictions; (3) the need for changes to be readily explained; and (4) a relatively isolated workstation and supervisor support when first learning tasks.  (*Id.* at 8-10.)

The Commissioner responds that substantial evidence supports the ALJ's mental RFC.  (Doc. No. 12 at 3.) The Commissioner asserts Kearns has not shown prejudicial error in the ALJ's evaluation of Dr. Wagner's opinion.  (*Id.* at 4.)  Regarding the state agency reviewing sources' opinions, the Commissioner asserts Kearns has not shown prejudicial error in the ALJ's evaluation, the ALJ's RFC was consistent with their opinions, and the ALJ was not required to accept opined limitations from opinions she found to be consistent and supported overall.  (*Id.* at 6-9.)  Further, the Commissioner maintains the ALJ did not claim medical expertise in fashioning the RFC.  (*Id.* at 9.)

A.      Dr. Wagner's Opinion

While Kearns raises his arguments regarding the treatment of Dr. Wagner's opinion in his RFC challenge, his argument appears to be that the ALJ failed to give a proper reason for discrediting Dr. Wagner's opinion – a separate issue from whether substantial evidence supports the RFC.

As Kearns applied for a POD and DIB in April 2018, the new regulations governing the consideration and articulation of medical opinions and prior administrative medical findings (20 C.F.R. § 404.1520c) apply.  Under the new regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 404.1520c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. §§ 404.1520c(a), 404.1520(b)(2).

The new regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single

14

analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

After describing Dr. Wagner's findings and opinion, the ALJ evaluated his opinion as follows:

The undersigned finds Dr. Wagner's opinion to be somewhat persuasive and assigns it some weight. However, Dr. Wagner's opinion appears to be based largely on the claimant's self-report during the single interview. However, the record as a whole supports a finding that the claimant is limited to simple, routine,

15

> repetitive tasks and limited interaction with [sic] to accommodate the claimant's documented anxiety, PTSD, difficulty with concentration, mistrust of others, and difficulty with crowds.  (6F/11, 12, 14, 31).  The claimant's mental impairments are fully accommodated by the residual functional capacity set forth above.

(Tr. 27.)

Kearns maintains the ALJ did not find Dr. Wagner's opinion was unsupported or inconsistent with the record, and there was "no evidence" to support the ALJ's determination that his opinions were "based largely" on Kearns's subjective comments.[4]  (Doc. No. 10 at 11.)  Therefore, Kearns asserts the ALJ "failed to build a logical bridge" between the record evidence and her conclusion that Dr. Wagner's opinions were based largely on Kearns's subjective statements.  (*Id.*)

While the ALJ did not use the terms "supportability" or "consistency" in her evaluation of Dr. Wagner's opinion, the Court agrees with the Commissioner that inherent in the ALJ's finding that Dr. Wagner's opinion appeared to be based largely on Kearns's subjective complaints is a finding that the opinion lacked the support of objective record evidence.  Further, the ALJ's determination that Dr. Wagner's opinion appeared largely based on Kearns's subjective reports goes to supportability and consistency.  In addition, the ALJ noted instances where Dr. Wagner based his opinion on what Kearns reported or described.  (Tr. 26.)  The Court's own review of Dr. Wagner's opinion reveals repeated use of "[t]he claimant reported" or "[t]he claimant described" in his assessment of Kearns's abilities and limitations in sustaining concentration and persistence in work-related activity, maintaining effective social interaction on a consistent and independent basis with supervisors, co-workers, and the public, and dealing with normal pressures in a competitive work setting.  (Tr. 1288-89.)  And Kearns fails to identify any record evidence, objective or otherwise, that supports Dr. Wagner's opinion.  Therefore, to the extent the ALJ erred in her articulation regarding the persuasiveness of Dr. Wagner's opinion, any error was harmless.

---

[4] The Court notes Kearns does not argue that the ALJ's articulation fails to meet the requirements of 20 C.F.R.  § 404.1520c(b)(1)-(3).

16

"No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result*." Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (citation omitted).  *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (citation omitted).

Therefore, the undersigned recommends the Court affirm the ALJ's evaluation of Dr. Wagner's opinion.

## B.    State Agency Reviewing Sources' Opinions

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a).  The ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence, 20 C.F.R. § 404.1546(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

The ALJ is obligated to consider the record as a whole.  *Hurst v. Secy'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985).  "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  "'[W]here the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.'"  *Davidson v. Comm'r of Soc. Sec.*,

17

No. 3:16CV2794, 2018 WL 1453472, at *2 (N.D. Ohio Mar. 23, 2018) (quoting *Moscorelli v. Colvin*, No. 1:15-cv-1509, 2016 WL 4486851, at *3 (N.D. Ohio Aug. 26, 2016)) (citing SSR 96-8p, 1996 WL 374184, at *7); *Cooper v. Comm'r of Soc. Sec.*, No. 2:18-cv-67, 2018 WL 6287996, at *5 (S.D. Ohio Dec. 3, 2018) ("[W]here, as here, the ALJ assigns significant weight to a particular opinion and states it is consistent with the record, he must incorporate the opined limitations or provide an explanation for declining to do so.") (citations omitted), *report and recommendation adopted by* 2019 WL 95496 (S.D. Ohio Jan. 3, 2019). *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). While the RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her*, 203 F.3d at 391.

An ALJ must provide a discussion at each step "in a manner that permits meaningful review of the decision." *Boose v. Comm'r of Soc. Sec.*, No. 3:16cv2368, 2017 WL 3405700, at *7 (N.D. Ohio June 30, 2017) (quoting *Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014). This discussion must "build an accurate and logical bridge between the evidence" and the ALJ's conclusion. *Snyder*, 2014 WL 6687227, at *10 (quoting *Woodall v. Colvin*, No. 5:12 CV 1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013)).

The ALJ's analysis included the following discussion of the state agency reviewing sources' opinions:

> The undersigned had fully considered the opinions of the State Agency consultants and find the opinions to be persuasive and assigns them some weight as they consistent with, and supported by, the record as a whole. The record documents the claimant has osteoarthritis of the hip (likely trochanteric bursitis) and mild degenerative changes of the lumbar spine. (9Fl21, 126, 127, 129, 130, 134; 14F/5, 6; l0F/39, 41, 44, 48). The claimant treated his hip pain with a single injection that eased his pain for six months. (14F/5). To treat his back pain and spasm, the claimant uses ibuprofen and cyclobenzaprine, yoga, stretching, and

walking. (14F/ 1-6). His functionality is not severely limited as his recent activities include caring for two young children and pulling them in a wagon, doing yard work, and walking. (3E; 14F/106). The State Agency consultants at the reconsideration level opined the claimant was capable of medium exertional level work with postural limitations. (3A/14-15). However, the undersigned finds the record is consistent with a finding that the claimant is capable of light exertional level work as was opined at the initial determination level. (lA/12-14). To accommodate the claimant's degenerative and osteoarthritic condition, the residual functional capacity above limits the claimant to light work, with no climbing of ropes, ladders or scaffolds; occasional stooping, crouching, and crawling; frequently climbing ramps and stairs, balancing and kneeling, and occasional exposure to unprotected heights or unprotected moving mechanical machinery. Even if the claimant were limited to never climbing ladders, ropes, and scaffold, with "occasional" limitations in all other postural activities, the claimant would still be able to perform all of the step-5 jobs listed below jobs [sic] that exist in significant numbers in the national economy. Additionally, although the claimant's lower extremity complaints are not supported by medical evidence, the current residual functional capacity would fully accommodate his lower limb complaints. As for the claimant's mental impairments, the consultants opined a mild limitation in the claimant's ability to understand, remember, and apply information, with moderate limitations in the remainder of the "paragraph B" criteria. (lA/10; 3A/1 1). However, the undersigned finds the record supports a moderate limitation in the claimant's ability to understand, remember, and apply information based on the claimant's testimony that he forgets what he is doing when he is in the middle of doing something, and has to trace back what he is doing. (Testimony). The residual functional capacity accommodates the claimant's difficulties interacting with other, [sic] issues with concentration, and adapting and managing himself as discussed in the record. (13F/2-5; 6F/11, 12, 14, 31; 3E/6, 7; lF/18, 21, 22).

(Tr. 27.)

Kearns maintains the ALJ erred by omitting the following limitations opined by state agency reviewing psychologist Dr. Matyi and state agency reviewing psychiatrist Dr. Finnerty and failing to explain why: (1) superficial interaction with others; (2) pace-related restrictions; (3) the need for changes to be readily explained; and (4) a relatively isolated workstation and supervisor support when first learning tasks. (Doc. No. 10 at 8-10.) The Court addresses each one of these limitations in turn.

### 1. Superficial interaction with others

Kearns argues that while the ALJ limited Kearns's ability to interact with others, the ALJ failed to account for the *quality* of that interaction (superficial) as opined by Drs. Matyi and Finnerty. (Doc. No. 10

at 9.)  The Commissioner responds that the RFC limited Kearns to occasional contact with supervisors and coworkers, which accounted for superficial interaction as opined.  (Doc. No. 12 at 7.)  In addition, the Commissioner asserts the RFC limited Kearns to no team or tandem tasks, which is a qualitative limitation on social interaction.  (*Id.*)

The Court disagrees that occasional interaction (a quantitative limitation) accounts for a limitation to superficial interaction (a qualitative limitation).  *See Walsh v. Colvin*, No. 3:15CV1708, 2016 WL 1752854, at *14 (N.D. Ohio May 3, 2016) ("Plaintiff argues, however, and the Court agrees, that the limitation to superficial interactions does not adequately address the state agency psychologists' specific limitation to 'work that does not involve frequent social interactions.'").  However, the Court agrees with the Commissioner that the ALJ's limitation to no team or tandem tasks is a qualitative limitation on social interaction and adequately addressed the opinion of Drs. Matyi and Finnerty that Kearns be limited to superficial interaction with others.  *See Collins v. Comm'r of Soc. Sec.*, No. 3:17 CV 2059, 2018 WL 7079486, at *6 (N.D. Ohio Dec. 7, 2018) ("Contrary to Plaintiff's argument, the ALJ restricted Plaintiff from 'team or tandem tasks' (Tr. 15), which logically require more than superficial interpersonal contact. This is a restriction on the quality of interpersonal contact."), *report and recommendation adopted by* 2019 WL 1409535.

### 2.  Pace-related restrictions

Kearns next argues the ALJ erred by not including pace-related restrictions in the RFC.  (Doc. No. 10 at 9-10.)  The Commissioner responds that the ALJ's limitation to "simple, routine, and repetitive tasks" accounts for pace-related restrictions.  (Doc. No. 12 at 8.)

Drs. Matyi and Finnerty limited Kearns to simple (1-2 step) and occasional complex (3-5 step) instructions.  (Tr. 88, 110.)  But they also limited Kearns to work with "[n]o strict time limits or production standards."  (*Id.* at 88-89, 110.)  The ALJ found the state agency reviewing sources' opinions

persuasive and assigned them "some weight as they [are] consistent with, and supported by, the record as a whole." (*Id.* at 27.) With respect to Kearns's mental impairments, the ALJ stated:

> As for the claimant's mental impairments, the consultants opined a mild limitation in the claimant's ability to understand, remember, and apply information, with moderate limitations in the remainder of the "paragraph B" criteria. (lA/10; 3A/11). However, the undersigned finds the record supports a moderate limitation in the claimant's ability to understand, remember, and apply information based on the claimant's testimony that he forgets what he is doing when he is in the middle of doing something, and has to trace back what he is doing. (Testimony). The residual functional capacity accommodates the claimant's difficulties interacting with other, [sic] issues with concentration, and adapting and managing himself as discussed in the record. (13F/2-5; 6F/11, 12, 14, 31; 3E/6, 7; lF/18, 21, 22).

(*Id.*) Therefore, the ALJ found a greater restriction than the Drs. Matyi and Finnerty as to Kearns's ability to understand, remember, and apply information, emphasizing a need to deviate from their opinions on this issue only. *Collins*, 2018 WL 7079486, at *7. The ALJ made no mention of pace in her RFC findings and analysis. (*Id.* at 20, 21-28.)

The ALJ found the state agency reviewing sources' opinions supported by and consistent with the record as whole. (*Id.* at 27.) While the Commissioner is correct that there is no requirement that the ALJ adopt the opinions "verbatim" in finding the opinions persuasive, the ALJ was still required to explain why the opinions were not adopted as the RFC conflicted with them. SSR 96-8p at *7. Here, the ALJ failed to include any pace restrictions in the RFC or explain why she did not incorporate any into the RFC. (Tr. at 21-28.) The Court disagrees with the Commissioner that the ALJ's limitation to "simple, routine, and repetitive tasks" addressed the pace restrictions opined by Drs. Matyi and Finnerty.[5] In another case

---

[5] The Court notes the case upon which the Commissioner relies in support of his argument dealt with a restriction to "a very low stress environment," amongst other non-exertional limitations (including avoiding contact with the general public), and not an explicit pace restriction of no strict time limits or production standards, as is the case here. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 436 (6th Cir. 2014). Further, the Sixth Circuit clarified its holding as follows: "Although it may not always be true that a RFC or hypothetical limiting the claimant to simple, routine, repetitive tasks and avoiding contact with the general public will account for each of the above factors, the manner in which the limitations arose in the case and their substantial overlap with one another as reflected in the opinions of the professionals substantially support the ALJ's RFC and hypothetical." *Id.* at 438.

where an ALJ limited a plaintiff to "simple, routine tasks," this Court held that an ALJ "cannot totally omit a pace restriction without explaining her reasons for doing so." *Collins*, 2018 WL 7079486, at \*\*6-7 (citing *Moretti v. Colvin*, No. 4:13-CV-01344, 2014 WL 37750, at \*10 (N.D. Ohio Jan. 6, 2014)).

"In these circumstances, the ALJ's failure to explain [her] decision deprived this court of a 'logical bridge between the evidence on the record and [her] conclusion," *Flesicher v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011), and left the Commissioner, in [his] brief on the merits . . . , to defend the ALJ's decision with impermissible, post-hoc rationalizations, *see S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947)." *Davidson*, 2018 WL 1453472, at \*2. Because the ALJ's opinion does not permit the Court to follow the "reasoning and treatment of" the state agency reviewing psychologists' opinions, the Commissioner's decision must be vacated and remanded for further proceedings. *Id.* at \*2 (quoting *Davis v. Comm'r of Soc. Sec.*, No. 1:16 CV 2446, 2018 WL 137779, at \*10 (N.D. Ohio 2018); *see also Cooper*, 2018 WL 6287996, at \*5.

### 3. The need for changes to be readily explained

Kearns argues that, like the pace-related restrictions discussed above, the ALJ omitted, without any explanation, any need for changes to be readily explained as opined by Drs. Matyi and Finnerty. (Doc. No. 10 at 10.) The Commissioner did not respond to this argument. (Doc. No. 12 at 6-10.)

Drs. Matyi and Finnerty opined that, due to Kearns's symptoms, he "would be limited to an environment without frequent changes in routine and where those changes could be readily explained." (Tr. 89, 111.) The ALJ found Kearns "can understand, remember, and carry out simple, routine tasks, make judgments on simple work, and respond appropriately to usual work situations and changes in a routine work setting with few and occasional changes." (*Id.* at 21.) The ALJ made no mention of the need for changes to be readily explained. (*Id.* at 21-28.)

This matter is already being remanded for error in the treatment of the state agency reviewing sources' opinions. On remand, the ALJ will have an opportunity to reconsider and properly articulate her RFC findings.

### 4. A relatively isolated workstation and supervisor support when first learning tasks

Kearns argues the ALJ also omitted, again without explanation, any limitation to a relatively isolated workstation and supervisor support when first learning tasks. (Doc. No. 10 at 10.) Kearns asserts this is "particularly concerning because the need for special supervision or a need for an isolated work environment does not appear consistent with competitive full-time employment." (*Id.*) The Commissioner argues the opinions "only say that Claimant 'may benefit' from such accommodations, not that they are required." (Doc. No. 12 at 8.) Therefore, the Commissioner maintains, the ALJ's RFC finding is consistent with the state agency psychologists' opinions. (*Id.*)

The opinions of Drs. Matyi and Finnerty read as follows: "May benefit from a relatively isolated work station and supervisory support when first learning job tasks." (Tr. 89, 110). It is apparent from the hearing transcript that, at least with respect to a relatively isolated work station, the ALJ believed the opinion was not written in vocational terms:

> Q        If an individual would require a work setting that would be relatively isolated --
>
> ALJ:     How would you define relatively isolated?
>
> ATTY:    Less than occasional interaction with co-workers, maybe, lets [sic] say 15, no more than 10 to 15 percent of the day having any interaction with co-workers and no more than occasional interaction with supervisors but such interaction with the supervisors must be supportive as opposed to being critical or, would that allow
>
> ALJ:     I think that, that I think we've got a problem because, and I know where you're getting that from, from the DDE but that's not in vocational terms so I'm not exactly sure if Mr. McVee is even going to be able to answer that question because that is not in vocational terminology.

23

(*Id.* at 69.)

However, there was no such exchange concerning the need for supervisor support when first learning tasks.

This matter is already being remanded for error in the treatment of the state agency reviewing sources' opinions.  On remand, the ALJ will have an opportunity to reconsider and properly articulate her RFC findings.

## VII.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED IN PART and VACATED AND REMANDED IN PART for further consideration consistent with this opinion.

Date:  February 3, 2020

                                     *s/ Jonathan Greenberg*
                                     Jonathan D. Greenberg
                                     United States Magistrate Judge

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**